UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

IN RE EXTRADITION OF AZRA BASIC   )   No. 5:11-MJ-5002-REW
                                  )
                                  )   OPINION AND ORDER

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court considers Azra Basic's motion to dismiss the complaint seeking her extradition to Bosnia and Herzegovina ("BiH") to face prosecution for the offense of war crimes against civilians. DE #18 (Motion). On March 9, 2011, the United States, on behalf of the government of BiH, filed a verified complaint to extradite Basic, a naturalized United States citizen, pursuant to 18 U.S.C. § 3184, the Treaty Between the United States and Servia for the Mutual Extradition of Fugitives from Justice (the "Treaty"), and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. DE #1 (Complaint), ¶¶ 1, 2. BiH seeks to prosecute Basic for the offense of war crimes against civilians under Article 142 of the Criminal Code of the former Socialist Republic of Yugoslavia and Article 173(1) of the Criminal Code of BiH. DE #50 (Amended Complaint), ¶ 4.[1] Specifically, BiH claims Basic murdered or tortured four individuals in 1992 during the Bosnian war. *Id.* ¶¶ 4, 14-17.

---

[1] Basic did not object to the United States's motion to amend the Complaint, and she concedes that the Amended Complaint largely does not affect the merits of her motion to dismiss. DE #52 (Response). Though filed, the Amended Complaint is not verified. However, the Amended Complaint did not result in warrant issuance because the amendment occurred long after the initial stages of the extradition case.

1

The Court issued a warrant for Basic's arrest on March 9, 2011, and United States Marshals arrested Basic on March 17, 2011. DE #9 (Order); DE #8 (Warrant). Basic, by counsel, later filed a motion to dismiss the Complaint. DE #18 (Motion). The United States responded (DE #25), Basic filed a Reply (DE #31), and the Court permitted the United States to file a Sur-reply (DE #36). On July 8, 2011, the Court conducted a status conference and hearing on Basic's motion to dismiss. DE #35 (Minute Entry). The Court directed the parties to file supplemental briefs addressing particular issues regarding the motion to dismiss and to submit additional information to aid in the Court's analysis. *Id.* Pursuant to the Court's Order, the United States filed a Supplemental Brief (DE #37), Basic filed a Response (DE #42), and the United States filed a Reply (DE #43). Basic's motion (DE #18) is ripe for the Court's determination.

The Court now resolves, in part, Basic's pending motion to dismiss. She sought dismissal of the extradition complaint in advance of any final hearing on several bases. The Court has reviewed the full briefing, which is extensive, as well as the arguments made at multiple hearings. Finding that it can resolve only part of the issues prior to the final extradition hearing, the Court **DENIES IN PART** the motion and **DEFERS IN PART** ruling on the dismissal arguments.

## ANALYSIS

Basic seeks dismissal under the following theories:

A) Basic argues that no valid treaty exists between BiH and the United States;
B) Basic argues that because she is a United States citizen, the Treaty does not authorize her extradition;
C) Basic argues that the war crimes prosecution in BiH is time-barred, thus precluding extradition under the Treaty's terms; and
D) Basic argues that BiH has failed to produce a "duly authenticated copy of the warrant of arrest" from BiH, a Treaty requisite.

The Treaty is in force, per the express positions of the respective sovereigns, the history of Serbian succession, and the uncontradicted tide of authority on the question. Further, while the Treaty itself does not authorize extradition of a United States citizen, Congress has properly bestowed that power by separate statute. As a result, the Court **DENIES** the motion as to arguments A and B.

As to argument C, the Court finds that the analogous federal statute of limitations for the murder component of the alleged war crime would be unlimited; the BiH prosecution thus would be timely irrespective of the status of any charging document in the record. However, the Court **DEFERS** until following the final hearing resolution on the torture aspect of the statute-of-limitations analysis.

Finally, as to argument D, the Court continues to query the effect of *Grin v. Shine* and the basis, under BiH and/or Republika Srpska law, for the cited documents to serve as "the warrant of arrest" in fulfillment of the Treaty. Further, the Court seeks to assure that there is no dispute as to the authoritative text of BiH and Republika Srpska laws that relate to the procedures the Bosnian entities employed with respect to Basic. The Court **DEFERS** a decision as to the warrant requirement fulfillment.

The Court reserves all probable cause and other issues to the final hearing.

*A. The Treaty is in force.*

Basic contends that the Treaty, originally entered between the United States and the Kingdom of Serbia in 1902, no longer is in effect. With no treaty, the predicate for extradition would lapse under the statutory authority, 18 U.S.C. § 3184, the vehicle for extradition during treaty existence. Basic's argument is that BiH was under governance separate from Serbia in 1902, and that while BiH may in the 1990s have broken from

Yugoslavia, an intervening sovereign and Serbian successor state, the lack of direct succession between Serbia and BiH itself is fatal to any successor-state theory linking BiH to the Treaty.

Certainly, the recorded state evolution reflects the tumult in the region over much of the twentieth century. The Treaty entered into force between the Kingdom of Servia/Serbia and the United States on June 12, 1902. *See* Treaty Between the United States and Servia for the Mutual Extradition of Fugitives from Justice, U.S.-Serb, Oct. 25, 1901, 32 Stat. 1890 (proclaimed May 17, 1909); DE #25-1 (May 17, 2011, Affidavit of Paul B. Dean ("Dean Aff.")), ¶ 3. In 1918, post-World War I, Serbia became a part of the Kingdom of Serbs, Croats, and Slovenes. Eventually, that entity, through name changes, became the Federal People's Republic of Yugoslavia. In *Ivancevic v. Artukovic*, 211 F.2d 565, 575 (9th Cir. 1954), the court of appeals expressly endorsed the applicability of the 1902 Serbian treaty, by succession, to the Federal People's Republic of Yugoslavia as a successor to the Kingdom of Serbia. *Ivancevic* recounted the history relative to the Serbia-to-Yugoslavia succession, expressly including the conduct and leadership pronouncements of contemporaneous leaders, and determined: "[I]t [Yugoslavia] was the successor of Serbia in its international rights and obligations." *Id.* at 573. Basic does not dispute the history or status to the point of *Ivancevic*.

In 1963, the entity again changed its name, this time to the Socialist Federal Republic of Yugoslavia ("SFRY"). BiH was one of six republics within that entity. In 1992, following BiH independence, the United States recognized BiH as a separate and independent state. Dean Aff., ¶ 7.

Basic stresses that BiH was not part of Serbia in 1902, an accurate geopolitical observation. However, BiH did become part of the later (1918) Kingdom and surely was under the Yugoslavian umbrella for much of the 1900s, including the time of *Ivancevic*. BiH joined a successor to Serbia, and the question is whether BiH's independent emergence carries forth the Treaty obligation under a separate succession.[2]

This Court, indeed any court, is poorly suited to weigh issues such as treaty status that sound in the political and impact international comity. The Supreme Court has counseled against judicial assessment of such issues and directed deference to the political branches. In *Terlinden v. Ames*, 22 S. Ct. 484 (1902), the Court declared, with respect to continued treaty validity: "We concur in the view that the question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard." *Id.* at 491 (further noting that prior "governmental action" concerning the continuing effectiveness of a treaty "must be regarded as of controlling importance"); *see also Kastnerova v. United States*, 365 F.3d 980, 986 (11th Cir. 2004) (citing *Terlinden* and observing: "Indeed, every other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination."); *Then v. Melendez,* 92 F.3d 851, 854 (9th Cir.1996) (validity of treaty following requesting country's independence from contracting country "presents a political question, and we must defer to the intentions of the State Departments of the two countries"); *Mingtai Fire & Marine Ins. v. United Parcel Serv.*, 177 F.3d 1142, 1145 (9th

---

[2] Under the state-succession doctrine, a new state may be bound by the obligations of a prior state. The imposition is only if and as the new state accedes: "When part of a state becomes a new state, the new state does not succeed to the international agreements . . . unless, expressly or by implication, it accepts such agreements and the other party . . . agree[s]." Restatement (Third) of Foreign Relations Law of the United States § 210(3) (1987).

5

Cir. 1999) (characterizing *Clark v. Allen*, 67 S. Ct. 1431 (1947), which assessed the status of a 1923 German treaty after World War II: "Recognizing that this presented a political question, the Court simply considered whether the actions and statements of the 'political departments' evinced an understanding that the treaty remained in force.").

Here, without question, both sovereigns directly represent that the Treaty remains valid and in force. *See* DE #1-3 (Declaration of Patricia McDonough for Department of State), ¶ 3 ("The relevant and applicable treaty provisions in full force and effect . . . are found in the Treaty[.]"); Dean Aff., ¶ 9 (opining that the Treaty "remains in force"). The pending BiH request is just one of several BiH has pursued under the Treaty. *Dean Aff.*, ¶ 8 (listing other BiH extradition requests per the Treaty).

BiH's conduct is consistent with the position communicated to the United States in 1992 through the first President of the new state. That communication, authenticated by the Department of State here, reflects the leader's intent that BiH "is ready to fulfill the treaty and other obligations of the former SFRY[.]" DE #39-5 (authenticated cable summarizing communication from President Izetbegovic to the Secretary of State). BiH has repeatedly acted in harmony with the view that this communication encompassed SFRY obligations including the Treaty.

Further, multiple cases have upheld the continued force of the Treaty. *Sacirbey v. Guccione*, 589 F.3d 52, 56 n.8 (2d Cir. 2009) ("This treaty applies to Bosnia as a successor state to the former Federal Peoples' Republic of Yugoslavia, which was, in turn, a successor state to the Kingdom of Serbia."); *In re Extradition of Bilanovic*, No. 1:08-mj-74, 2008 WL 5111846, at *6 (W.D. Mich. Dec. 3, 2008) (cataloguing cases and observing: "No court has held otherwise.").

Basic raises historical issues concerning BiH's evolution as a state and makes arguments concerning lists of treaties identified either in the BiH constitution or in the Code or other publications of the United States. While those issues offer some facile opposition to the notion of a continuing Treaty, the substantive analysis focuses on what the states actually have done and expressed, per *Terlinden*. The United States and BiH have each declared and acted in accordance with Treaty validity, both in this case and throughout the BiH modern era. *See Bilanovic*, 2008 WL 5111846, at *3 (detailing BiH's numerous extradition requests under the Treaty since 1992). The Court here is bound to respect the positions of the respective executive branches, positions consistently supported by years of mutual operation under the Treaty. The Court thus **DENIES** Basic's motion premised on treaty invalidity.

B. *The United States has proper authority to extradite a citizen, per 18 U.S.C. § 3196.*

Basic, a naturalized United States citizen since January of 2007, DE #18-2 (Certificate of Naturalization), claims the United States lacks authority to extradite because of her citizen status. Facing a statute that expressly permits extradition in this treaty context, Basic argues that the statute, 18 U.S.C. § 3196, is unconstitutional. The argument fails under established Supreme Court precedent.

The Treaty textually eliminates any *duty* of extradition with respect to party-state citizens or subjects: "Neither of the high contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this Treaty." Treaty, Art. V. Though the provision might on first reading suggest reserved discretion to extradite, the Supreme Court has interpreted such language as not sanctioning extradition, even as a discretionary act. In *Valentine v. United States ex rel. Neidecker*, 57 S. Ct. 100 (1936),

the Court assessed like language under a treaty with France. *Id.* at 101 (treaty provided: "Neither of the contracting Parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention."). After noting the legal truism that "surrender of its citizens by the government of the United States must find its sanction in our law," *id.* at102, the Court construed the clause at issue in the context of treaty law and executive decisions at the time. Because the Secretary of State and Supreme Court had, prior to that treaty's formulation, required inclusion of an affirmative statement of discretionary authority to allow extradition of a citizen, the *Valentine* Court rejected any implied grant from the relevant language. *Id*. at 106 ("[T]hat excepting clause was inserted without qualification, and a familiar clause granting a discretionary power was omitted. . . . [W]e know of no rule of construction which would permit us to supply the omission.").

Thus, under *Valentine* alone, Basic would be correct as to the lack of authority to extradite. However, in 1990, Congress passed 18 U.S.C. § 3196. That statute provides:

> If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met.

This statute undoubtedly purports to supply the very authority the Treaty here would lack under *Valentine*.

Basic's argument in avoidance challenges the validity of the statute; she contends the statute is unconstitutional as a treaty modification not in accordance with constitutional enactment procedures. One case has accepted this theory. *Gouveia v.*

8

*Vokes*, 800 F. Supp. 241, 249-59 (E.D. Pa. 1992) (accepting view that statute constitutes unconstitutional infringement on constitutional treaty-making power).

The Court rejects Basic's position. The statute is valid. The Supreme Court long has recognized Congress's power to provide for extradition by enactment, with or without a treaty. *Grin v. Shine*, 23 S. Ct. 98, 102 (1902) ("But notwithstanding such treaty, Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that foreign criminals shall be surrendered upon such proofs . . . as it may judge sufficient."). Indeed, although *Valentine* refused to find an implied grant of authority in the language of the French treaty, the Court openly invited Congress to fix the omission through legislative enactment:

> [W]e are constrained to hold that his [the President's] power, *in the absence of a statute conferring an independent power*, must be found in the terms of the treaty . . . . However regrettable such a lack of authority may be, *the remedy lies with the Congress, or with the treaty-making power* wherever the parties are willing to provide for the surrender of citizens[.]

*Valentine*, 57 S. Ct. at 106 (emphases added). Section 3196 is such an independent power and congressional remedy as envisioned by *Valentine*. Importantly, *Valentine* explicitly referenced the legislative option as an alternative to treaty modification.

The Court agrees with *Hilario v. United States*, 854 F. Supp. 165 (E.D.N.Y. 1994), and rejects the analysis of treaty-Section 3196 interplay in *Gouveia*. The Treaty language itself, per *Valentine* (from 1902, the same year as the Treaty), does not give the Executive Branch the power to extradite United States citizens, but the Treaty certainly contains no **prohibition** of such extradition through other sources of authority. Basic is wrong to characterize the Treaty as forbidding extradition. Rather, it simply does not, of

9

itself, authorize the act. As such, the statute, which provides authority to extradite outside of the Treaty, does not contravene or attempt to amend Treaty obligations. A decision by Congress to require less for extradition from America than a treaty might otherwise require, relative to its own sovereign choices, simply is a matter within the legislative prerogative. *Grin*, 23 S. Ct. at 102 (comparing the effect of demanding *additional* formalities with the choice to "intentionally waive[]" treaty requisites through legislative action).

The Court thus finds, concerning the citizen status of Basic, that § 3196 authorizes the extradition of a United States citizen. The Court **DENIES** Basic's motion to dismiss based on her citizen status.

C. *At least as to the murder component of the alleged war crime, the prosecution is timely.*

The Court resolves in part Basic's limitations argument. She posits that any BiH prosecution is time-barred under applicable principles, thus foreclosing extradition. The Court finds that the murder component alleged is timely and will defer analysis of the torture components pending proof at the final hearing.

The Treaty requires a timeliness analysis by its very terms:

> Extradition shall not be granted, in pursuance of the provisions of this Treaty, if legal proceedings or the enforcement of the penalty for the act committed by the person claimed has become barred by limitations, according to the laws of the country to which the requisition is addressed.

Treaty, Art. VII. The Court thus must assess whether proceedings here, as to the claimed conduct, would be barred by limitations under United States law. The parties differ sharply on the interpretation that applies.

10

Limitations analysis here calls for definition of the closest federal analog to the crime reflected in the conduct alleged. *See Clarey v. Gregg*, 138 F.3d 764, 766-67 (9th Cir. 1998) (addressing distinct treaty and focusing on "nature of" the charged conduct under federal law: "The object of Article 7 [the limitations section] of the Treaty is to preclude extradition of a person whose prosecution in the United States would offend our national statute of limitations if he had committed his criminal conduct here."). As the Ninth Circuit recently restated: "In determining what United States statute of limitations is applicable, this Court looks to the substantive offense under United States law which is most closely analogous to the charged offenses, and applies the statute of limitations applicable to that offense." *Sainez v. Venables*, 588 F.3d 713, 716 (9th Cir. 2009) (quotation omitted), *cert. denied*, 130 S. Ct. 3399 (2010).

Basic faces war crime charges, and the underlying behavior includes, factually, assertions of murder and of torture.[3] The conduct is from the spring of 1992. *See* DE #1-5, pp. 8-12 (Order on Conducting of Investigation). As to the murder allegations, the extradition complaint accuses Basic of intentionally killing Blagoje Djuras by cutting his throat with a knife. This followed, allegedly, lengthy intentional beating of the victim to the point of unconsciousness. *See* DE #1, ¶ 14; *see also* DE #1-5, at 92 (Statement of Zdravko Vidovic) (attributing to Basic, as she killed Djuras, "Look how Arkan woman kills!"). This conduct undoubtedly would support a charge for murder in the first degree under United States law, specifically 18 U.S.C. § 1111. The statute includes, within that definition, any "willful, deliberate, malicious, and premeditated killing," and the assertions as to the death of Djuras, if taken as true, qualify. First-degree murder is a

---

[3] The statutes in play, defining the crimes within the rubric of "war crimes," include murder. *See* DE #51 (Amended Complaint), ¶ 4.

capital crime, for which there is no statute of limitations. *See id.* at (b); 18 U.S.C. § 3281; *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1397-98 (9th Cir. 1986) (citing *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986)) ("[M]urder is a capital offense falling under 18 U.S.C. § 3281 rather than 18 U.S.C. § 3282."); *Clarey*, 138 F.3d at 766 ("There is no statute of limitations for felony murder."). Should Basic's conduct have occurred here, federal prosecution would not be time-barred.

Basic creatively asks the Court to modify its assessment of United States law by engrafting the remedial limitations of BiH. Thus, because BiH has no death penalty, Basic contends that the federal capital statute of limitations in 18 U.S.C. § 3281 should not apply. The Court has found no cases accepting the remedial limiter Basic suggests, namely that the absence of a punishment option in BiH would modify the statute-of-limitations calculus under federal law. Indeed, as the United States argues, even an offense limitation under federal law, *e.g.*, an offender characteristic that would foreclose capital punishment, does not change the statute-of-limitations analysis. *See*, *e.g.*, *United States v. Gallaher*, 624 F.3d 934, 940 (9th Cir. 2010) (noting that capital crime analysis is tied inextricably to "nature of the offense" rather than availability of death penalty as to particular defendants), *cert. denied*, 131 S. Ct. 2990 (2011); *United States v. Ealy*, 363 F.3d 292, 296-97 (4th Cir. 2004) (whether crime is capital "depends on whether the death penalty may be imposed for the crime under the enabling statute," not whether it is available in a particular case). The "punishable" measure relates to the generic offense character, not penalty application or applicability in a concrete case. That BiH law features no death penalty does not modify the hypothetical timeliness analysis under United States law that the Treaty requires.

To the extent the complaint encompasses murder allegations, Article VII of the Treaty would not block extradition based on timeliness. The Court therefore **DENIES** Basic's motion to dismiss the complaint as to the murder component of the war crime charge. As to the remaining statute-of-limitations argument, the Court **DEFERS** a ruling pending the final hearing. Questions persist concerning application of the five-year limitations period provided in 18 U.S.C. § 3821, the United States's efforts to borrow post-1992 criminal statutes (and/or statutes of limitations enacted following the alleged crimes), and the tolling efficacy of the 1993 "criminal charge." The Court makes no ruling on those issues pre-hearing. The hearing will address any flight proof and argument, under 18 U.S.C. § 3290, and the Court elects to receive that proof as part of the overall conclusion of the statute-of-limitations issue relative to the torture components of the war crime alleged.

D. *Concerning the warrant issue, the Court requires further information before ruling on the adequacy of the documents tendered by the United States.*

At the final hearing, the Court will discuss three distinct sub-topics related to the issue of whether the United States (representing BiH) has produced "a duly authenticated copy of the warrant of arrest" as the Treaty, in Article III, requires.

First, the Court will query and discuss whether the alternative holding of *Grin v. Shine* — that the United States intentionally waived a comparable warrant requirement by not including it as an element in the extradition statute — applies in this context. *See Grin*, 23 S. Ct. at 102 (calling requirement to produce "authenticated copy of the warrant of arrest" "one of the requirements of the treaty which Congress has intentionally waived").

Second, the Court will query the procedural basis, if any, under BiH law for treating the July 9, 2007, District of Doboj prosecutor letter as "the arrest warrant," per the characterization of BiH in the record. *See* DE #39-4 (Letter), at 5.

Third, the Court gives notice[4] that it has researched independently the criminal codes of BiH and the Republika Srpska, using the following sources:

- Criminal Procedure Code of Bosnia and Herzegovina:
  http://www.ohr.int/ohr-dept/legal/oth-legist/doc/criminal-procedure-code-of-bih.doc

- Criminal Code of Bosnia and Herzegovina
  www.iccnow.org/documents/criminal-code-of-bih.pdf

- Republika Srpska Criminal Procedure Code:
  http://legislationline.org/download/action/download/id/1663/file/abe391d8b2619a3d21ff21bf34e7.htm/preview

- Criminal Code of the Republika Srpska:
  http://www.ohr.int/ohr-dept/legal/crim-codes/default.asp?content_id=5129

The parties will have an opportunity, post-hearing if necessary, to comment on the propriety of these sources as proof of foreign law.

\* \* \* \* \*

The Court thus **DENIES** the motion to dismiss concerning treaty validity and the categorical argument concerning extradition of a United States citizen under the Treaty. The Court further **DENIES** the motion as to the statute of limitations concerning the murder component of the charged war crime. The Court **DEFERS** until after the final hearing any ruling on the remaining statute-of-limitations arguments and on the fulfillment of the Treaty's warrant requirement.

This the 4th day of November, 2011.

---

[4] Federal Rule of Civil Procedure 44.1 does not formally apply, but the Court gives this notice in fairness and pursuit of a sound result to permit either side to object to the accuracy of the source consulted and/or to offer an alternative source for a definitive version of the codes in question



Signed By:
*Robert E. Wier*
United States Magistrate Judge